TENNESSEE CENT. RY. CO. v. SHACKLETT.—147 S. W. (2d) 1054.

Middle Section. September 21, 1940.

Petition for Certiorari denied by Supreme Court, March 1, 1941.

564

Walter Stokes and Roberts & Roberts, all of Nashville, for plaintiff in error.

Carmack Cochran and G. S. Moore, both of Nashville, for defendant in error.

FELTS, J.  James L. Shacklett, a switch foreman, was killed by being caught between the side of a box car and a warehouse loading platform; and his daughter as administratrix brought this action to recover for his death.  She sued the Tennessee Central Railway Company, the Tennessee Central Station Company, and the owner of the warehouse, C. B. Ragland Company, alleging two causes of action, one under the common law against all the defendants and one under the Federal Employers' Liability Act against the Railway Company and the Station Company.  Upon the Railway's motion she was required to elect and elected to proceed under the Federal Employers

Liability Act, 45 U. S. C. A., sec. 51 et seq., taking a non-suit as to the Station Company and a mistrial being entered as to the Ragland Company. She obtained a verdict against the Railway for $4,500, which was reduced by remittitur to $2,500, upon which judgment was entered.

The Railway appealed in error. Its chief insistence is that a verdict should have been directed for it because there is no evidence of any negligence on its part, and because the evidence shows, as a matter of law, that the deceased assumed the risk.

Shacklett and his crew were engaged in switching three cars which were moving in interstate commerce, all of them containing goods shipped to the Ragland Company in Nashville, Tennessee, from points outside the state. The crew were placing the cars on an industrial track alongside the Ragland warehouse. This warehouse was on the southwest corner of Molloy Street and Basil Alley, the street running east and west and the alley north and south. The warehouse had a concrete loading platform, fronting on the alley, along which the track ran, and fronting also on Molloy Street. The part of the platform fronting on the track was 6 feet 1 inch wide and 301 feet 7 inches long. The floor of the platform was 4 feet 4 inches above the level of the alley, about the same height above the rails, and about 4 inches higher than the bottom of the floor of a box car on the track. The east margin of the platform was so close to the track that there was only 9 or 10 inches of clearance between the platform and the side of a car. At a point 16 feet 11 inches south of the north end of the platform there had been erected a gang plank support to enable the Ragland employees to use a gangplank in walking back and forth between the warehouse and another building just across the alley, which also belonged to the Ragland Company. This gangplank support consisted of two upright timbers with a horizontal timber on top of them. This support was about 2 inches lower than the platform and projected some 5 inches further toward the track. So the clearance at this point was reduced to 4 or 5 inches.

It was Shacklett's duty as foreman to protect traffic at the Molloy Street crossing and to see that the cars were properly placed, their brakes set and their wheels ''chocked.'' From the north toward the south the track ascended a grade of about 7%. The flood waters of the Cumberland River had been over the track and up nearly to the floor of the platform. The waters had receded to a point below or north of Molloy Street, leaving sediment, mud and debris over the track, in Molloy Street, and around the platform. The members of Shacklett's crew were the engineer, the fireman and two switchment, Richards and Hilton. The engine was behind the string of cars pushing them south or up the grade toward the designated locations at which they were to be placed alongside the platform. Due to the mud and water on the track, the crew were having difficulty,

having made two unsuccessful attempts to push up the cars, and were engaged in the third attempt. In order to get up the momentum to make the grade, the train had backed down some distance north of Molloy Street. Shacklett was standing in Molloy Street a little north of its center and west of the track, on the same side with the platform and about 30 feet north of it, flagging this crossing. Richards was standing on the front car, Hilton was standing on the car next to the engine, and the engineer was looking through the front window of his cab at Hilton, watching for signals. It was Richards' duty to give signals and Hilton's duty to transfer them to the engineer to stop in case of an accident or when the cars reached their proper place.

On account of the mud and water Shacklett was wearing rubber boots. As the train approached and about the time the front car got even with him, Shacklett undertook to climb up on the side of it, taking hold of one of the ladder irons with his hands and stepping up on the sill step or stirrup, which was 13½ inches below the bottom of the car, with his right foot. This foot slipped from the stirrup, and, swinging on with his hands, he placed his left foot in the stirrup, but before he had time to step from the stirrup up to the first rung of the ladder, which would have cleared him of the platform, his hip struck the corner of the platform and his body was "rolled" between the side of the car and the platform four or five turns to about the point of the gangplank support, when he fell beneath the floor of the car, was drawn under its wheels and both his legs were severed. He died in a few minutes.

It is insisted that the Railway was guilty of negligence in several particulars, all of which, we think, are embraced in two main propositions, viz.: That Richards, if he had been keeping a proper lookout, could have prevented the accident by timely signal to the engineer to stop the train; and that by allowing the platform and gangplank support to be in dangerous proximity to the track and by not clearing the track of the sediment, mud and debris the Railway breached its duty to use ordinary care to provide a reasonably safe place of work for its employees.

None of the trainmen saw Shacklett's peril. On the north side of Molloy Street there were large buildings on both sides of the track. The fireman was on the far side of the engine from Shacklett. The buildings were so close to the track the engineer could not look from the side of his cab and see ahead, could not see Shacklett, and could not see the loading platform until the cab got within 20 or 30 feet of Molloy Street. For the same reason Hilton, the switchman on the car next to the engine, could not see Shacklett and could not see the platform until the car he was standing on got within 30 or 40 feet of Molloy Street. All this seems to be conceded by counsel. They say: "Richards, the only man who could see and who should have

seen, was standing with his back to the south looking north and facing the engine when Berridge gave the danger signal." Berridge was one of the Ragland employees standing on the platform, who began waving and "hollering" to stop the train, when he saw Shacklett swinging on the car being carried toward the platform. He said Shacklett "had already crossed two-thirds of Molloy Street" when he first noticed Shacklett's predicament and began to signal to stop the train. Molloy Street was 47 feet wide. That is to say, from the time Berridge saw Shacklett was in peril to the time he struck the platform, he was carried about 16 feet. The speed of the train was not shown. At the time he began to signal Berridge saw only one member of the train crew, the switchman who, he said, was on "the car next to the engine." This was Hilton, not Richards. Richards was standing about the middle of the top of the front car. His view of Shacklett was cut off by the car before its front end got even with Shacklett, and his view of the platform was cut off by the car and a shed over the platform before the front of the car reached the north end of the platform. This is shown by photographs sent up. The engineer and Hilton saw the employees on the platform waving, and Richards heard them "hollering," at about the same time. As the engineer applied his emergency brakes, he saw the signals from the switchmen. The train stopped within about 15 feet, which was as soon as possible. We think these facts, which are not disputed, afford no basis for an interference of negligence on the part of Richards or any other member of the crew, Toledo, St. L. & W. R. Co. v. Allen, 276 U. S., 165, 167, 48 S. Ct., 215, 72 L. Ed., 513.

As stated, the clearance between the side of the car and the platform was 9 or 10 inches and at the gangplank support the clearance was only 4 or 5 inches. From the platform to the first rail it was 3 feet 9½ inches, 4 feet 8½ inches between the rails, 6 feet 2 inches from the center of the track to the platform, and 5 feet 9 inches from the center of the track to the gangplank support. The extreme width of the first car from the floor up was 10 feet 10 inches, counting the handhold projections, while that of the other two cars was 1 or 2 inches less. And, as stated, the bottom of the floor of the car was 4 feet above the rails, while the top of the platform was 4 inches higher. Counsel say this lack of sufficient clearance was a violation of one of the Railway's own safety rules, which required a clear space of at least 7 feet between the center of the track and the platform and gangplank support. The rule was that roadmasters "must see that a clear space of at least seven feet is preserved on either side of the main track or side track, except permanent structures located in accordance with proper authority." We think this platform and support were "permanent structures," but this is not determinative of the question whether the Railway was negligent in allowing them to be in such proximity to the track over which it required its employees to operate its trains.

■ It has been held negligence under the Employers' Liability Act for a railroad company to maintain or to allow obstructions so close to its tracks as to endanger its employees while performing their duties in operating trains. Kanawha & M. R. Co. v. Kerse, 239 U. S., 576, 36 S. Ct., 174, 60 L. Ed., 448 (a timber over switch track); Austin v. N., C. & St. L. Ry.[1] (Sup. Ct. of Tenn.), filed July 26, 1919, certiorari denied, 250 U. S., 667, 40 S. Ct., 14, 63 L. Ed., 1198 (coal bin near switch track); Grand Trunk Western R. Co. v. Boylen, 7 Cir., 81 F. (2d), 93 (factory truck on loading platform near switch track); Davis v. Crane, 8 Cir., 12 F. (2d) 355 (low overhead bridge); Reading Co. v. Geary, 4 Cir., 47 F. (2d), 142, 79 A. L. R., 226 (low overhead bridge); Looney v. Norfolk & W. Ry. Co., 102 W. Va., 40, 135 S. E., 262, 137 S. E., 756, 48 A. L. R., 806 (car retarder installed upon a coal tipple over track). But the maintenance of mail cranes, semaphores, switchstands and overhead bridges so near the track as to endanger employees while performing their duties, has been held not negligence but a risk incident to the service which the employees assume. Southern Pac. Co. v. Berkshire, 254 U. S., 415, 41 S. Ct., 162, 65 L. Ed., 335; Chesapeake & O. R. Co. v. Leitch, 276 U. S., 429, 48 S. Ct. 336, 72 L. Ed., 638; Atlantic Coast Line R. Co. v. Powe, 283 U. S., 401, 51 S. Ct., 498, 75 L. Ed., 1142; New York, C. & St. L. R. Co. v. McDougall, 6 Cir., 15 F. (2d) 283; Cincinnati, N. O. & T. P. Ry. Co. v. Heinz, 227 Ky., 816, 15 S. W. (2d), 138.

■ The platform and gangplank support obstructed the clearance only within the 4-inch space from the bottom of the car floor to the top of the platform. Above that one riding on the car was not endangered by the platform or the gangplank support. This situation was manifestly less dangerous than one where the obstruction extended over 8 feet high, as did the coal bin in Austin v. N., C. & St. L. Ry., supra, or over the whole area overhead, as did the obstruction in other cases cited above. Loading platforms, such as this one, are a great convenience, if not a necessity, in rail transportation; and it would be going far to condemn their use as negligence. There is authority for the view that it is not negligence. Stone v. Chicago & N. W. Ry. Co., 176 Minn., 104, 222 N. W., 641. Such a platform, practically on a level with the floor of the cars, would seem less dangerous than mail cranes, semaphores, switchstands and overhead bridges, obstructions into which trainmen often ride because they are absorbed in performance of their duties and are momentarily forgetful of the dangers. That was not the case with Shacklett. No doubt he intended to step up to the first rung of the ladder so as to clear the platform, and failed to do this only because his foot slipped and he lost his balance. That this was partly due to the condition under foot, we think, was a reasonable inference by the jury from

---

[1] No opinion for publication.

the evidence. We also think the jury could reasonably find that in allowing this condition to exist, in not clearing the track of the sediment, mud and debris, the Railway failed to use reasonable care for the safety of its employees and was guilty of negligence which was a substantial factor in causing Shacklett's death. Cincinnati, N. O. & T. P. Ry. Co. v. Thompson, 6 Cir., 236 F., 1. Cf. Chicago, M. & St. P. R. Co. v. Coogan, 271 U. S., 472, 46 S. Ct., 564, 70 L. Ed., 1041.

■■ The defense of assumption of risk has now been abolished (Acts of Congress, Aug. 11, 1939, c. 685, sec. 1, 53 Stat. 1404, 45 U. S. C. A., sec. 54) ; but when this accident happened, and when the case was tried below, this defense was available in all actions under the Federal Employers' Liability Act, except in cases where the violation by the carrier of a Federal statute enacted for the safety of employees contributed to the employee's injury or death. Great Northern Railway Co. v. Leonidas, 305 U. S., 1, 59 S. Ct., 51, 83 L. Ed., 3. We think the decisions which we are bound to follow compel the conclusion, as a matter of law, that Shacklett assumed the risk from which his death resulted. According to these decisions, an employee assumes the ordinary risks of his employment and also assumes the extraordinary risks, or risks caused by the employer's negligence, which are obvious, or fully known and appreciated. Delaware, L. & W. R. Co. v. Koske, 279 U. S., 7, 8, 49 S. Ct., 202, 73 L. Ed., 578, 579; Cincinnati N. O. & T. P. Ry. Co. v. Brown, 158 Tenn., 75, 12 S. W. (2d), 381; Luck v. Louisville & N. R. Co., 167 Tenn., 350, 69 S. W. (2d), 899; Draper v. Louisville & N. R. Co., 17 Tenn. App., 213, 66 S. W. (2d) 1003, and cases there cited.

■■ That Shacklett knew the material conditions giving rise to the risks is not disputed. He was 72 years of age, active and intelligent, and he had worked for the Railway 32 years. While the evidence is that for more than a year before his death he had supervised placing cars on the track at the loading platform only about six times, he was familiar with the relative location of the platform and the track. Witnesses on both sides said they had seen him walking along the platform when the cars were standing on the track alongside the platform. The close clearance was obvious to any one walking along the platform and seeing a car standing there. The switchmen and the Ragland employees all knew that there was not enough space between the platform and the side of a car to clear a man. This danger was so obvious that the Ragland employees, as soon as they saw Shacklett swinging on the car being carried toward the platform, began waving and "hollering" to try to stop the train to prevent his injury. Also the sediment, mud and debris on the track were obvious and known to Shacklett. He was wearing rubber boots on account of this. He must be held to have assumed the risks and dangers incident to this condition under foot. Draper v. Louisville & N. R. Co., supra; Luck v. Louisville & N. R. Co., supra. Also he must be

held to have assumed the risks of trying to get on the car under such conditions. Jacobs v. Southern R. Co., 241 U. S., 229, 36 S. Ct., 588, 60 L. Ed., 970. So also must he be held to have assumed the risk due to the lack of clearance between the car and the platform. Southern Pac. Co. v. Berkshire, 254 U. S., 415, 41 S. Ct., 162, 65 L. Ed., 335; Chesapeake & O. R. Co. v. Leitch, 276 U. S., 429, 48 S. Ct., 336, 72 L. Ed., 638; Atlantic Coast Line R. Co. v. Powe, 283 U. S., 401, 51 S. Ct., 498, 75 L. Ed., 1142; New York, C. & St. L. R. Co. v. McDougall, 6 Cir., 15 F. (2d) 283.

Counsel for the administratrix rely upon Austin v. N., C. & St. L. Ry., supra, where it was held that the employee did not assume the risk arising by reason of the lack of sufficient clearance between the coal bin and the car. It there appeared that, while Austin had a general knowledge of the location of the coal bin, he was not aware of its close proximity to the track, or at least whether he was, was a matter of controversy which was for the jury. But the close proximity in the present case was perfectly obvious to any one walking on the platform, as Shacklett did, with cars standing within a foot of it.

Our conclusion that a verdict should have been directed for the Railway on the ground that the deceased assumed the risk renders unnecessary a consideration of the other matters presented by the Railway's assignments of error.

For these reasons the judgment of the circuit court is reversed, the verdict is set aside, and the suit is dismissed at the cost of the administratrix.

Faw, P. J., and Crownover, J., concur.