[No. 28670. Department One. November 20, 1942.]

W. H. PIERCE, *Respondent*, v. SPOKANE INTERNATIONAL RAILWAY COMPANY *et al., Appellants.*[1]

[1]Reported in 131 P. (2d) 139.

432

*Post, Russell, Davis & Paine,* for appellants.

*C. C. Dill* and *Edge, Keith & dePender,* for respondent.

DRIVER, J.—Plaintiff, a former railway conductor, brought this action under the Federal employers' liability act (45 U. S. C. A., §§ 51-59), against defendant railway corporation and the trustee appointed in proceedings for its reorganization under the United States bankruptcy laws, to recover damages for injuries sustained in the course of his employment. A trial to a jury resulted in a verdict for plaintiff. By appropriate and timely motions before and after the verdict, defendants questioned the sufficiency of the evidence, but all such motions were denied. From the judgment entered on the verdict, the defendants have appealed. For convenience, we shall refer to the railway company as if it were the only appellant.

The pertinent facts, as the jury could have found them, may be summarized as follows: Appellant operates a railroad extending from Spokane north to Eastport, Idaho. It passes through Sandpoint, Idaho, in a general northerly-southerly direction, and the station is on its easterly side. The wooden depot platform between the station building and the track is approximately twelve feet wide. The eaves of the building extend out over the platform about six feet. The door leading into the station is near the northerly end of the platform. There is a watertank beside the tracks one hundred feet south of the station.

On the morning of February 27, 1940, respondent was the conductor in charge of a train making the run from Eastport to Spokane. The schedule called for its arrival at Sandpoint at 9:20 a. m. and departure therefrom at the same time, but it was customary for the engineer to take on water at the watertank, an operation which took about three minutes. The train that morning consisted of the locomotive and tender, a baggage car, a day coach, and a sleeping car. Each of the cars was about sixty feet long.

The train was on time as it approached the station, and the engineer slowed down preparatory to making the usual stop, with the engine opposite the watertank. It was necessary for respondent to go into the depot to record the time of arrival and departure of the train and to pick up some orders. He went to the vestibule between the baggage car and the day coach, opened the door next to the depot, climbed down on the steps, and, at a point almost opposite the station door, while the train was moving two to four miles an hour, stepped to the station platform. He testified that he saw a small spot of snow on the platform as he was about to step down, but thought he had avoided it. As his feet struck the platform, he slipped and

fell under the moving train, suffering the injuries for which he brought suit.

It was not snowing or raining when the train arrived at Sandpoint, but it had snowed the night before. The snow had been cleared off the station platform by a section foreman at seven o'clock that morning, but the warmth inside the building had melted the snow on the roof, and the water dripped from the eaves on the platform. This water and a misty rain which had fallen froze and formed a slippery film on the platform. The surface looked as though it were wet, but was, in fact, covered by the film of ice. (The doctor called to attend respondent slipped and fell on this ice, as did his father who accompanied him.) The station agent had been in or about the depot from 8:30 in the morning up to the time of the accident. Neither he nor any of the other employees of appellant made any inspection of the platform or put any sand or salt on it or did anything else to remedy its icy condition after it had been cleared off by the section foreman.

A code of transportation rules, which had been adopted by appellant in common with many other railroad companies, provided that vestibule doors be kept closed while the train was in motion, and that employees alighting from a train, when practicable, get off the rear end of the rear car. Respondent testified that he alighted from the train before it stopped in order to save time; that he had done the same thing on every run he had made over the line during his three years' service as a conductor; that the superintendent of the road and a number of appellant's other employees had seen him do so but had never instructed him to do otherwise; and that he did not get off the rear platform of the rear car at the time of the accident for the reason that it was a sleeping car, and appellant company's rules specified that "Train

employees should not pass through dining, sleeping or private cars, except when necessary in performance of duty."

The appeal presents two questions, which, broadly stated, are: First, was there sufficient evidence of negligence on the part of the railway company to warrant submission of the case to the jury; and, second, did respondent, under the recited circumstances, as a matter of law, assume the risk of alighting from a moving train? We shall discuss these questions in the order stated.

The first section of the employers' liability act (45 U. S. C. A. (Sup.), § 51) provides, in effect, that every common carrier by railroad, while engaged in interstate commerce, shall be liable in damages to any person suffering injury while employed by the carrier in such commerce when such injury results, in whole or in part, "from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works . . . or other equipment."

■ Contributory negligence does not bar recovery by the employee, but is to be considered only in mitigation of damages, it being the jury's duty to diminish the damages in proportion to the amount of negligence attributable to the employee. 45 U. S. C. A. § 53. Therefore, we are not concerned with the question of contributory negligence.

■ It was appellant's duty to exercise ordinary care to keep its depot platform in such condition that respondent could use it with reasonable safety in the performance of his functions as a conductor. *Harding v. Railway Transfer Co.*, 80 Minn. 504, 83 N. W. 395; *Sankey v. Chicago, R. I. & P. Ry. Co.*, 118 Iowa 39, 91 N. W. 820; *Gibson v. Iowa Cent. R. Co.*, 115 Minn. 147,

131 N. W. 1057; *Melody v. Des Moines Union R. Co.,* 161 Iowa 695, 141 N. W. 438, 48 L. R. A. (N. S.) 179 (affirmed on rehearing); *Reams v. Chicago, M., St. P. & P. R. Co.,* 180 Minn. 534, 231 N. W. 236; *Johnson v. St. Louis & S. F. R. Co.,* 164 Mo. App. 600, 147 S. W. 529. See, also, *Missouri Pac. R. v. Aeby,* 275 U. S. 426, 430, 72 L. Ed. 351, 48 S. Ct. 177.

In the *Reams* case, the conductor had stepped from the front door of the caboose, while the train was still in motion, to the station platform. After the caboose passed, he was found beside the track and so badly injured that he subsequently died. There was packed snow and ice between the first rail of the track and the edge of the platform and the ice extended over the platform for from one to three feet. Melting snow had caused water to stand upon the edge of the platform and it froze and caused the icy condition. The supreme court of Minnesota, holding that the question whether or not the defendant railway company was negligent was one of fact for the jury, said, p. 536:

"From the photograph and evidence the jury might find that the condition had existed for such length of time that the defendant had ample notice thereof and ample time to remove the ice on the platform or render the place reasonably safe by the use of cinders, ashes or sand."

The court also quoted as follows from *Gibson v. Iowa Cent. R. Co., supra,* p. 537:

" 'The general rule is that a railway company is not liable to its employees for injuries resulting from climatic conditions, such as snow and ice; but within its yard limits it must exercise a degree of care commensurate with the risks to prevent the accumulation of snow and ice in such quantity, form, and location as to be a menace to the safety of its employees working in its yards.' "

In the instant case, it was necessary for respondent to go into the station at Sandpoint in the discharge of his duties, and appellant had not made provision in its schedule for his train to remain at the station for any appreciable length of time. Respondent customarily stepped to the platform before the train stopped, a custom which was known to appellant's superintendent and other employees. In view of this practice, the icy condition of the platform on the morning of the accident presented, as to respondent, an extremely hazardous condition. As stated, it had not snowed since the night before. The fact that the water dripping from the eaves of the station was freezing upon the platform, it seems reasonable to infer, should have been readily discernible to appellant's employees working in and about the station that morning—the station agent had been on duty since 8:30 a. m. The jury could well have found that, by a reasonable inspection before the train came into the station, the dangerous condition of the platform could have been discovered and appropriate corrective measures taken.

Furthermore, there was then in force a rule of appellant company which read, in part:

"Agents must make frequent inspections of yards, platforms, offices, buildings and surroundings; see that the station platforms, and walks are properly cleared of snow, ice, or dirt; . . ."

The rules and customs of a railway company determine the standards of what the employees must anticipate in the performance of their duties, and they are entitled to act in reliance thereon. *Easter v. Virginian R. Co.,* 76 W. Va. 383, 86 S. E. 37; *Kurn v. Stanfield,* 111 F. (2d) 469, and cases cited under footnote three at bottom of p. 473.

It is our conclusion that the evidence was sufficient

to take the case to the jury on the question of appellant's negligence.

We pass now to appellant's second main contention, which is that respondent, as a matter of law, assumed the risk of alighting from a moving train, particularly since he so alighted in violation of appellant company's rules.

We shall not consider whether appellant's contention would have been tenable under the employers' liability act as it existed prior to the amendment which became effective August 11, 1939 (45 U. S. C. A. (Sup.), § 54), because we think the amendment is controlling. We set out § 54 as amended, indicating by italics the new material added by the amending act:

"In any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to, or the death of, any of its employees, *such employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier;* and no [such] employee shall be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

Prior to the amendment, the rule was that an employee assumed the ordinary risks of his employment and, also, the extraordinary risks and those due to the negligence of his employer which were obvious or were fully known to the employee *except* in a case where a contributory factor in the employee's injury was the employer's violation of some safety statute, such as the safety appliance acts or the hours of service act. *Jacobs v. Southern R. Co.*, 241 U. S. 229, 60 L. Ed. 970, 36 S. Ct. 588; *Boldt v. Pennsylvania R. Co.*, 245 U. S.

441, 62 L. Ed. 385, 38 S. Ct. 139; *Delaware L. & W. R. Co. v. Koske,* 279 U. S. 7, 73 L. Ed. 578, 49 S. Ct. 202; *Great Northern R. Co. v. Leonidas,* 305 U. S. 1, 83 L. Ed. 3, 59 S. Ct. 51.

Appellant urges, in the language of its brief, that ". . . this defense [assumption of risk] still holds in all actions brought under this act [employers' liability act] except where the accident or injury is brought about through the failure of the railroad company to comply with the Safety Appliance Act."

It is apparent that appellant contends for substantially the same construction of § 54 which obtained prior to the enactment of the amending act of August 11, 1939, and adoption of such contention would make the amendment utterly meaningless. The amendment provides that no employee shall be held to assume the risks of his employment in any case where his injury results "in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." As the supreme court of Iowa observed in *Melody v. Des Moines Union R. Co. supra,* p. 701: "A corporation cannot act; it can perform no duty; it can neglect no obligation save by and through its agents and employees."

It would seem, therefore, that, giving the language of the amendment its plain and ordinary meaning, it has taken away the defense of assumption of risk in those cases where the injury of the employee is wholly or partly due to the negligence of the carrier. Since, as we have pointed out, there is, in the record here, substantial evidence of negligence on the part of appellant carrier, it logically follows that the jury could have found that respondent did not assume the risk, and the question should not be determined as one of law.

Respondent takes the position that the amend-

ment under consideration has entirely abolished the defense of assumption of risk in actions brought under the employers' liability act. He has not cited any case in point in which the employee's cause of action arose subsequent to the effective date of the amendment, but he calls our attention to certain remarks, in the nature of *dicta,* in cases decided after that date. The following excerpt from the case of *Tennessee Cent. R. Co. v. Shacklett,* 24 Tenn. App. 563, 569, 147 S. W. (2d) 1054, is typical: "The defense of assumption of risk has now been abolished." This broad language probably was not designed for application to every conceivable factual situation. If it had been the intention of Congress to abrogate entirely the defense of assumption of risk, it could easily have so provided in plain language. The fact that the defense is removed in certain specified instances implies that there are other instances in which it has not been abolished.

The fourth circuit court of appeals has considered and fully discussed the effect of the amendment in a recent case which was not available in the published reports at the time the case at bar was argued. *Tiller v. Atlantic Coast Line R. Co.,* 128 F. (2d) 420. That was an action under the employers' liability act brought by the executrix of the estate of a sergeant of police in the employ of the defendant railway company. He was killed in the company's yard when a passing car struck him while he was inspecting seals on another car. The court held that a verdict for the defendant had been properly directed for the reason that the amendment did not modify the rule concerning the duty of railroad employees in freight yards to look after their own safety. The line of reasoning which led the court to that conclusion is as follows:

The court first outlined the rules with reference to the doctrine of assumption of risk, as they existed

prior to the amendment, much as we have stated them earlier in this opinion. It then reviewed and cited a considerable number of cases in which liability on the part of the carrier had been denied on the ground that there was no neglect of duty to safeguard the injured employees from the ordinary risks of the business, it being considered that the employees had assumed such risks and agreed to look out for themselves. The court then called attention to the argument advanced in behalf of the employee in the *Tiller* case, to the effect that the doctrine of assumption of risk had been abolished by the amendment, and that the carrier was, therefore, liable for injuries to one of its employees in its railroad yards or elsewhere, unless it took precautions for his safety commensurate with the danger he was likely to encounter; and said, p. 423:

"Superficially considered, the argument seems to follow a logical sequence; but it loses its force when the true nature of the doctrine is understood. It is necessary to bear in mind that the phrase 'assumption of the risk' is used in more than one sense and that it is not true to say, as the appellant's argument implies, that in every case where the doctrine was formerly applicable, there was negligence on the part of the employer. The truth is that there may be assumption of the risk by an employee without negligence either on his part or on the part of his employer. At common law a master was not responsible to his servant for injuries which did not flow from the master's neglect but were inherent in the nature of the business. The risk of these dangers the employee assumed, and it was in this sense that the phrase was originally used.

"But there is another sense in which an employee is said to assume the risk, that is, when he has knowledge that his safety is endangered by some neglect on the part of his employer and nevertheless continues to work without complaint and without promise of repair or remedy.

"*It was to cut off this right of the carrier to avoid the consequences of its own neglect* and in recognition

of the needs of employees exposed to the grave hazards of railroading that the amendment of 1939 was enacted. Under the section in its orginal form the carrier had been exculpated from liability in such a hard case as *Hallstein v. Pennsylvania R. Co.*, 6 Cir., 30 F. 2d 594, where an employee was held to have assumed the risk of his employer's failure to furnish a safety belt although he had demanded it and proceeded with the work only when threatened with discharge. This case was mentioned in Report No. 661 of the Senate Committee on the Judiciary of the 76th Congress, 1st Session, of June 22, 1939, as illustrating an exceptionally harsh feature of the rule which it was desired to eliminate; and it is clear from the report as a whole that the purpose in mind was to enlarge the employees' protection by providing *that in all cases in which injury results from the negligence of an employee or fellow servant, the defense of assumption of the risk should no longer be available,* and at the same time to retain the provision of the existing law that the employer should be deprived of the defense if the violation of any safety statute should contribute to the injury of an employee.

"The conclusion is inescapable that Congress did not intend to enlarge the obligation of carriers to look out for the safety of their men when exposed to the ordinary risks of the business, and that in circumstances other than those provided for in the amended section of the statute, the doctrine of the assumption of the risk must be given its accustomed weight." (Italics ours.)

In the instant case, alighting from a moving train to a station platform covered with a film of ice was not one of the ordinary risks of respondent's employment; and, as stated, there is substantial evidence of negligence on the part of appellant carrier. Under the reasoning of the *Tiller* case, then, it cannot be said that respondent assumed the risk as a matter of law.

Judgment affirmed.

ROBINSON, C. J., STEINERT, and SIMPSON, JJ., concur.