### GULF, COLORADO & SANTA FE RY. CO. v. WATERHOUSE.
#### No. 4589.

Court of Civil Appeals of Texas. Beaumont.
Sept. 22, 1949.

Rehearing Denied Oct. 26, 1949.

Kenley, Sharp, & Shepperd, Longview, Wigley, McLeod, Mills & Shirley, Galveston, McLeroy & McLeroy, Center, for appellant.

Fisher & Tonahill, Jasper, Lane & Anderson, Center, for appellee.

WALKER, Justice.

On August 13, 1947, Marvin Waterhouse was employed by Gulf, Colorado & Santa Fe Railway Company as a section hand, and during the afternoon of that day was engaged in cutting brush on the Railway Company's right of way in Shelby County under the direction and supervision of his foreman. He became overheated while doing this work, and as a result sustained serious injuries. Subsequently, he brought this action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., alleging that he was caused to become overheated and that his injuries had been caused by various negligent acts and omissions on the part of his employer and praying recovery of damages from said employer accordingly. Marvin Waterhouse is referred to hereinafter as Plaintiff, and the Railway Company as Defendant.

The Defendant, among other matters, plead that Plaintiff was an experienced workman who knew what he had to do and his own physical capacity to perform his duties, and that Plaintiff's injuries were caused wholly or in part by his own failure to exercise care for his safety.

The cause was tried to a jury, and of their findings the following are relevant: (Issue 3) The duties assigned Plaintiff by his foreman during the afternoon of August 13, 1947, subjected Plaintiff to a hazard from heat which was greater than ordinary. (4) The foreman was negligent in assigning to Plaintiff such duties as he

did on the afternoon of August 13, 1947, (5) and this negligence was a proximate cause of Plaintiff's injury. (6) Before sustaining injury on August 13, 1947, Plaintiff informed his foreman that he was getting too hot. (7) After Plaintiff informed the foreman that he was getting too hot, the foreman directed Plaintiff to continue working. (7-a) After being directed by the foreman to continue working, Plaintiff resumed the usual duties of the task he had been assigned. (8) In directing Plaintiff to continue working after being informed by Plaintiff that he was getting too hot, the foreman was guilty of negligence, (9) which was a proximate cause of Plaintiff's injury. (11 and 17, the same) A preponderance of the evidence did not show that on the time and occasion in question Plaintiff disregarded his own safety, or (14) failed to quit work before he became overheated, or (20 and 23, identical), knowing his own strength and ability, failed to stop work after becoming overheated, or (26) failed to keep a proper lookout for his own safety. (28) Plaintiff's injuries were not the result of an unavoidable accident.

Under Issue 10, the jury assessed Plaintiff's damages at $7,000, and the trial court rendered judgment for Plaintiff against Defendant for this sum. From this judgment Defendant has appealed.

Defendant has assigned 7 Points of Error for reversal.

In Points 1 to 5, inclusive, Defendant says that there is no proof of any negligence on Defendant's part. The argument goes further and raises a question of causation, but we shall treat the argument as raised by the Points of Error.

The following evidence, most of it from Plaintiff's testimony, is relevant to these five Points:

(a) Plaintiff was a Negro man, and on August 13, 1947, the date he became overheated, he was 40 years old.

He had spent his entire life in Shelby County, and had always earned his livelihood by manual labor. His formal education ended with the 4th grade. Until about six years prior to August 13th, he had been a farmer. Then he secured employment in which he operated an ice truck, and he did this until some time in February, 1947, when he was employed by Defendant. He worked for Defendant as a member of a section gang, that is, a crew of workmen who maintained Defendant's tracks and kept the right of way in order, from the time he was hired until he became overheated on August 13, 1947, and he returned to work for Defendant on the following Monday. He said that he found himself unable to work and that he returned home. According to his testimony he has been unable to, and has done no work of any consequence since that time. Plaintiff said that before this incident of August 13, 1947, he had been a strong able-bodied man, accustomed to doing hard manual labor; that he had been regularly employed; and that he had had no trouble getting and keeping employment.

There was testimony from some of Defendant's witnesses (and none to the contrary) that Plaintiff had been a good workman while in Defendant's employ. Joe Gardner, a member of Plaintiff's gang, said that Plaintiff did as much work as the other members of the gang, and that Plaintiff seemed to be strong and able and willing to work. Plaintiff's foreman said that Plaintiff made a good "hand". He testified: "He done pretty good work. Right." Plaintiff said that he worked regularly, six days a week, for Defendant.

(b) The foreman of Plaintiff's gang was T. A. Jackson. Mr. Jackson directed and supervised the work of Plaintiff's gang. He had employed Plaintiff originally to work for Defendant, and he had authority to hire and to discharge his subordinate workmen.

(c) During the morning of August 13, 1947, Mr. Jackson had his gang (including Plaintiff) at work cutting grass around some bridges. This task was completed shortly before noon; and Mr. Jackson moved the gang farther along the track to a cattle guard where they had work to do and there they ate their dinner. At 1:00 o'clock P.M., Mr. Jackson divided his gang, and put Plaintiff and two others to cutting

brush on the Defendant's right of way. The remainder of the gang were put to cutting grass around the cattle guard.

This was the first time that Plaintiff had had to cut brush for Defendant. He had done such work around his farm, however.

(d) Plaintiff said that the place where he was working "was right in the woods; pasture; thickety all grown up around the cattle guard." By "thickety grown up" he meant "lots of brush; knee high on up to higher than my head; higher."

This brush was of oak and pine, and some of that which Plaintiff had to cut was as large as Plaintiff's arm.

There was grass in the right of way. Plaintiff said: "It was up about knee high in briars."

The right of way at this point ran through woods. The timber came up to the fences. However, Plaintiff said that it was more open about the cattle guard. He was unable to state the distance of the fences from the tracks, and the proof does not show how far away from the cattle guard he was.

Plaintiff used an implement for cutting brush which he called a brush axe, and he described it as follows: "It was an outfit about that long (indicating), with a hook on it, bill on it. I reckon it weighed about seven or eight pounds; long handle thing. I used it with both hands. You don't swing it or use it like a shovel. You chop with it."

It is apparent that cutting such brush as Plaintiff described, with such an instrument, was arduous labor. Plaintiff referred to some of the things he customarily did, saying that his gang pulled track, put in ties, laid rails, and cut grass; and he said that cutting brush was more arduous than cutting grass, or lining tracks, or things of that kind. Mr. Jackson testified:

"Q. Brushing is a hot job, isn't it? A. Cutting right of way is pretty hot.

"Q. That's about the hottest job you have on the-a section gang does, isn't it? A. Well, I couldn't say that. It's all pretty hot out on that railroad.

"Q. That, though is hotter than usual when you put them in there in brush up to their neck and shoulders and start them to using a brush axe, isn't it? A. I don't know whether it would be any hotter than just ordinary work.

"Q. It would be in a hotter spot, wouldn't it, than they ordinarily work in? A. Well, I would say that in the evening part of the day that it would be a little hotter cutting right of way, because it would be down where no air at all could get to you. Naturally, in the evening, it is warmer than it is in the morning part of the day.

"Q. And assuming that it was in the afternoon, well, it would be hotter than ordinary work. A. Yes.

"Q. That you do on the railroad? A. Yes, I think—I would think so.

"Q. It would expose a man to more hazard from the heat than any other type work. A. Yes.

"Q. That you do, wouldn't it? A. Yes, sir."

There was other work than this brush cutting to which Plaintiff and his gang could have been assigned. Mr. Jackson said that he could not at the time keep up with the work he had to do.

(e) The weather during the afternoon of August 13th seemed to the Plaintiff to be very hot and sultry; and he said that he felt no breeze while at work. Later in the afternoon, apparently after he had stopped cutting brush, there came a very sudden and very hard rain; he and the others were wet by this rain.

All of the proof concerning temperature and humidity is in the form of opinions, expressed in such general terms as "awful hot" and "really hot".

(f) Plaintiff's description of how he became overheated, and of what occurred between him and his foreman, was as follows: He said that he worked there that afternoon about half an hour (cutting brush) before anything happened to him. "I was chopping and I commenced to feeling dizzy about my head. Well, I told some of them boys working with me, I says, 'I'm getting kind of crazy about my head, getting too hot or something.' They said, 'Well, you better rest.' So I went on * * * I commenced to getting funny

about the head, getting too hot, way I was feeling. I stuck my axe up in the ground, went up where Mr. Jackson was, told him I was feeling dizzy and crazy about my head. He was up there in the shade at the water keg. (which Plaintiff thought was about 100 feet distant) I told him that I was getting crazy about the head, and hot; and something was wrong. And I told him it was too hot out there for me, I was just about knocked out. He said: 'It ain't hot; go on back to work.' Says: 'We got to get this brush and stuff cut.' So I just turned around and walked on off, went on back down there and went to work." He returned to the same place where he had left off work, and began again to cut brush, He said: "I worked about another half an hour and went back up there and told him I had to go in." He returned to Mr. Jackson this second time because he "took a pain in my head; roaring." This was a hard pain, in the forepart. of his head, between his temples, and a thumping and roaring came in his ears. This occurred after he had obeyed Jackson's order to return to work. He said that this throbbing and popping "came on me after I went back and went to work. Best I know of, I went back out there and went to work and that popping and roaring came in my head and that pain. And I went back to him again (this is the second time he went to Jackson). I told him I couldn't make it and I had to go in. He told me, says, 'Well, you are going to have to wait until the train runs. We ain't going in now.' He says: 'You just piddle around here until we get ready to go in.' I went on down there in the woods and laid down in the shade." He did not return to work. "I just piddled around there." He returned home with the crew, when they quit work for the day.

(g) His two fellow employees, who were cutting brush near him, were doing the same kind of work with the same kind of brush axe under the same conditions, but they did not become overheated.

(h) Plaintiff said that he returned to work after his first complaint to Mr. Jackson because Mr. Jackson "told me to go back." Plaintiff did not feel free to dis-

regard this instruction and to start some other kind of work because "he told me to go back to brushing."

Mr. Jackson himself testified that he told his gang what to do and when and where to work. He said that he expected obedience and if his gang disobeyed him, he had the right to suspend or to discharge them.

(i) There is no evidence whatever that Mr. Jackson had attempted or was attempting to force his workmen to work faster than usual or at any certain speed or, indeed, that he had required them to accomplish their tasks in any given time or that he had given them any order except to begin work at their assigned tasks. So far as this record shows, his gang were permitted to work at such a rate as they individually chose, and thus to adopt their labor to the conditions in which they had to work.

Points 1 to 5, inclusive, are overruled. The findings of the jury establish two grounds of negligence, to wit, (Issue 4) in assigning to Plaintiff such duties as were assigned to him on the afternoon of August 13, 1947, and (Issue 8) in directing Plaintiff to continue working after he had told his foreman that he was getting too hot. We hold that the finding of negligence under Issue 8 and the relevant finding of proximate cause under Issue 9 were supported by the proof. If the finding under Issue 4 refers to the act of the foreman in setting the plaintiff to work cutting brush when the gang returned to work after eating dinner, as it presumably does, then we hold that it was not supported by the proof. Our grounds for these conclusions follow.

■ (1) The injurious consequences of Plaintiff's having become overheated during the performance of his work constitute an "injury" within the meaning of that word as used in the first section of the Federal Employers' Liability Act, Title 45 U.S.C.A. § 51.

■ (2) It was not enough on this record that Plaintiff was injured by reason of performing his duties for Defendant. To establish a cause of action against De-

fendant under the Federal Employers' Liability Act, Plaintiff had to prove that Defendant was negligent respecting him and that this negligence was a legal cause of his injury. The Act so provides. Title 45 U.S.C.A. § 51. The Supreme Court of the United States has consistently so held, and the requirement of negligence as a basis of the carrier's liability was not repealed by the amendment of the 4th section of the Act Title 45 U.S.C.A. § 54, in 1939, which abolished the defense of assumption of risk from "the negligence of any. of the officers, agents, or employees of such carrier." Eckenrode v. Pennsylvania R. Co., 335 U.S. 329, 69 S.Ct. 91, 93 L.Ed. —; Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. —; Urie v. Thompson, Trustee, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. —; Lillie v. Thompson, Trustee, 332 U.S. 459, 68 S.Ct. 140, 92 L.Ed. 73; Anderson v. Atchison, Topeka & Santa Fe R. Co., 333 U.S. 821, 68 S.Ct. 854, 92 L.Ed. 1108; Ellis v. Union Pacific R. Co., 329 U.S. 649, 67 S.Ct. 598, 600, 91 L.Ed. 572, page 576: "The Act does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability. is his negligence, not the fact that injuries occur." Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967; Tennessee Central Railroad Company v. Shacklett, 24 Tenn. App. 563, 147 S.W.2d 1054. Plaintiff's brief contains an extended argument respecting "assumption of risk", but the rules pertaining to the defense are of no consequence under the Federal Employers' Liability Act when the Employer's negligence is not a legal cause of the Employee's injuries. See the comments of Justice Frankfurter in Tiller v. Atlantic Coast Line R. Co., and see the opinion of the Commissioner of Appeals in West Lumber Co. v. Smith, 292 S.W. 1103. There is nothing to the contrary in Kansas City Southern Ry. Co. v. Chandler, Tex.Civ.App., 192 S.W. 2d 304.

■ (3) The master certainly owes his servant the duty to use care for the servant's safety in ordering the servant into the performance of work. Thus in Hugo, Schmeltzer & Co. v. Paiz, 104 Tex. 563, at page 567, 141 S.W. 518, 520, the Court said: "If the evidence shows direction on the part of the vice principal to the deceased in the performance of any work in and about the master's business and in the administration of such business, and in the due performance of such work under the direction of the vice principal, the deceased received injuries from which death resulted, the master would be liable, provided there was negligence shown on the part of the vice principal in directing the performance of the work—in this case, the releasing of the truck wheels from the grip of the elevator so as to continue in the performance of the work previously begun and which had been suspended by the fastening of such wheels between the floors of the building and elevator so as to arrest the movement of the elevator." Plaintiff's foreman would probably be Defendant's vice principal under the decision just cited, because he had authority to hire and to discharge his subordinate workmen, but the matter is of no significance under the Federal Employer's Liability Act, which abolished the fellow-servant rule as a defense.

■ (4) Doubtless many orders by the master expose the servant to *some* risk of harm; but whether the master is negligent in ordering his servant to perform a task depends upon whether he ought to realize that the order exposes the servant to an *unreasonable* risk of harm. No question concerning negligence in failing to ascertain facts arises on this appeal, and the following comments will serve to illustrate our meaning. Thus in Webb's Pollock on Torts it is said: "a reasonable man can be guided only by a reasonable estimate of probabilities. If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behaviour we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are

barely possible. He will order his precaution by the measure of what appears likely in the known course of things." P. 45. And in the Prosser on Torts it is said: "The idea of risk necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may follow. A risk is a danger which is apparent, or should be apparent, to one in the position of the actor." P. 220. Further: "In the light of the recognizable risk, the conduct, to be negligent, must be unreasonable. Nearly all acts, of course, carry some remote possibility of harm to another, and no man so much as rides a horse without some chance of a runaway. The risks against which the actor is required to guard are those which society recognizes as sufficiently great to demand precaution." P. 221. Thus here the Plaintiff's foreman was not negligent in originally ordering Plaintiff to cut brush, or in ordering him to return to that work after Plaintiff complained to him about his condition, unless he ought to have known that his orders subjected Plaintiff to a risk of harm from the prevailing heat which was unreasonable within the meaning of these comments.

■ (5) We agree with Defendant that on the proof before us, Plaintiff's foreman was not negligent in originally ordering Plaintiff to cut brush when the crew returned to work at 1:00 o'clock, after eating their dinner. The proof shows that the day was hot, or "very" hot, and sultry, that no breeze blew upon Plaintiff while he was at work, and that the labor required of Plaintiff was arduous physical labor. On the other hand, it does not appear that the foreman forced the pace of the work or that he set a task to be performed within a fixed time. So far, the case is simply one where the foreman only orders his men to do certain work, leaving them free to adjust their efforts to the prevailing weather and their own physical capacities. Plaintiff was an experienced workman and was accustomed to doing manual labor in hot weather. Until he first complained to the foreman about his condition, there is nothing shown in

the record which could have suggested to the foreman that this work was dangerous to Plaintiff. On such facts the foreman necessarily must have anticipated that the members of his gang would become hot while doing the work assigned to them, but he certainly need not have anticipated that they would become overheated and ill.

■ (6) However, the proof summarized in our preliminary statement does show that the foreman was negligent in ordering Plaintiff to return to work after Plaintiff had complained to him of the effect which the work had had upon him; and the jury could properly find, as they did under Issue 7, that the foreman did give Plaintiff an *order* to return to work. This proof referred to shows that Plaintiff told the foreman that he was becoming overheated, and the circumstances known to the foreman at the time, namely, the prevailing heat and closeness of the air, the arduous nature of Plaintiff's task, and the Plaintiff's physical condition, were enough to put the foreman upon notice that Plaintiff could not continue to do such work without becoming ill, even though he attempted to lessen his exertions, and the foreman's order to Plaintiff to return to work was accordingly wrongful. The following statement from Doty v̇. Ft. Worth & D. C. R. Co., 127 Tex. 521, 95 S.W.2d 104, 105, supports our conclusion regarding the proof of both grounds of negligence established by the jury's findings: "(The foreman) had the right to assume that he was dealing with a man in normal physical condition and capable of doing heavy work like that required of members of a bridge gang, and that such a man, knowing his own strength, would not push or pull beyond his capacity to endure. In the absence of a showing of knowledge on his part that Doty (the workman) was not in such condition, it cannot be said that there is any evidence that he failed to act as an ordinarily prudent person would have done under the circumstances, or that such a person, situated as he was, could have reasonably foreseen or anticipated injurious consequences to flow from the doing of the act." And in Louisville & N. R. Co. v. Williams, 165 Ky. 386, 176 S.W.

1186, L.R.A.1915E, 613, the Court of Appeals of Kentucky in holding, 176 S.W. page 1189, that the servant had assumed the risk of overheating, referred to the fact that the servant had not asked leave to rest from his labors. We think that, in effect, the Plaintiff did ask relief here. The duty which we have thus imposed upon Defendant is well within the range of the duties imposed upon the carrier in the decisions listed above in paragraph (2), and is within the limits of foreseeability of harm to the servant which have been set out in those decisions. Assuredly the carrier may be liable under the Federal Employers' Liability Act for negligently exposing the servant to the elements of the weather and thereby causing· the servant an injury. Smith v. American Woolen Co., 77 N.H. 391, 92 A. 334; Pullman Co. v. Montimore, 5 Cir., 17 F.2d 2; Koofos v. Great Northern R. Co., 41 N.D. 176, 170 N. W. 859; Newberry v. Central of Georgia R. Co., 5 Cir., 276 F. 337. These decisions are not in point on the facts but they illustrate and enforce the same general duty to the servant of due care for the servant's safety which we have enforced. Of the decisions cited by Defendant, the only one which might be thought in point against our holding that the foreman was negligent in ordering the Plaintiff to return to work after Plaintiff had informed him of the effect which the work had had upon him is Chestnut v. Chicago, B. & Q. R. Co., 284 Ill.App. 317, 1 N.E.2d 811, and we decline to follow that decision if it is in conflict with our holding.

█ (7) These comments also dispose of Defendant's apparent argument· that the foreman was not negligent because Plaintiff was the best judge of his own strength and that the foreman could assume that Plaintiff would avoid becoming overheated. No such assumption could be made by the foreman under the circumstances attending Plaintiff's complaint to him. Defendant's brief contains the following statements: "In connection with Plaintiff's testimony that the foreman told him 'It ain't too hot; go on back to work', says this Defendant did not in any manner amount to compulsion but was nothing more than the expression of the opinion of said foreman (we have already held that the jury was justified in treating the statement of the foreman as an *order*); but in the opinion of the Defendant, if it were conceded that what the foreman said amounted to a command, it would not have authorized Plaintiff, if he found himself unequal to the task, to continue in the work until he was injured." And elsewhere from the brief: "Considering the foregoing argument defendant says that no one was better able than plaintiff to judge to what extent he could exert his own strength and work under the heat of the sun without injury to himself, or when his power of endurance of the heat had reached a point beyond which he ought not to have worked." These statements, of course, do not take into account the fact that Plaintiff attempted to quit the work and was prevented from so doing by the order of his foreman; but they bring to mind applications of the defense of assumed risk and suggest further that Plaintiff's return to work and his performing work amounted to negligence on his own part and that this negligence was the sole cause of his injury. The Federal Employers' Liability Act applies to this case, as Plaintiff has pointed out, and thus the defense of assumed risk, including the extensions of this defense referred to in the majority opinion in Tiller v. Atlantic Coast Line R. Co., is not available to Defendant. Whether Plaintiff was negligent or not was submitted to the jury in several special issues; all of these issues were found in Plaintiff's favor and none of these findings have been attacked. The jury were authorized to find that the foreman's order to Plaintiff to return to work, after Plaintiff complained to him, was a legal cause of Plaintiff's injuries, as they necessarily did under Issue 9. See paragraph (h) of our statement of proof. Plaintiff's obedience to the order was not an intervening act of an independent agency, as a matter of law, but the immediate, intended and expected consequence of the foreman's order. It can not be said that Plaintiff *knew* that he would be injured if he went back to work. Since the order was a legal cause of the servant's injuries,

662

this was enough to make Defendant liable under the Federal Employers' Liability Act. See Title 45 U.S.C.A. § 51. We proceed to consider Defendant's remaining Points of Error.

In Point 6, Defendant says that the jury discussed and considered attorneys' and doctors' fees in arriving at their verdict, and in Point 7, that they discussed and considered "insurance".

The trial court's order overruling Defendant's motion for new trial is in general terms, and we must accordingly assume that it was based upon such of the evidence as will support it. Points 6 and 7 are overruled on the following grounds:

Regarding Point 6:—There was proof that attorneys' and doctors' fees were referred to only once, and were not discussed; that the reference was made in a jocular spirit, just after the jury had retired and before they took up consideration of the court's charge; and (according to Juror Thurlow) that the statement amounted to something like this, that the lawyers and the doctors would get it all anyhow. There was some proof from Jurors Bright and Hudson that after the reference to attorneys' fees someone said that this matter could not be considered by the jury. The relative triviality of the occurrence, if any there was, appears from the fact that four of the jurors (Pearce, the foreman, and Pate, Poore and Billingsley) heard nothing said about attorneys' or doctors' fees. Juror Bailey gave some testimony indicating that he thought his agreement to the sum found as damages was influenced by the reference made to attorneys' fees; but we attach no more weight to such testimony than we attach to a juror's *denial* that his verdict was affected by such matters. The juror has no more power to destroy his verdict than he has to sustain it. Too, there was some testimony from Bailey indicating that he acted in a spirit of compromise in agreeing to the sum found as damages.

Regarding the matter assigned in Point 7:—Juror Golding, the only juror questioned regarding this matter, testified: "Q. —I'll ask you whether or not any remark was made in the jury room during the deliberation with reference to Workmens' Compensation Insurance? A. Yes, I believe so.

"Q. Do you recall who made such a remark? A. I believe it was Mr. Elliott. If I'm not mistaken.

"Q. What was said with reference to compensation insurance? A. Well, I ain't positive but it seems to me like—he said if it had killed him or something like that he would have got $8,000.00. And some of them made suggestion then to come to Seven Thousand; you know, that would bring up the low ones and down the high ones, and get together.

"Q. Was that before the $7,000.00 figure was arrived at? A. It seems like it was. I ain't positive, Jack. Must have been."

The action, of course, was not brought under the Workmen's Compensation Law, Vernon's Ann.Civ.St. art. 8306 et seq., and the juror understood this. Too, Plaintiff had only been injured, not killed; the sums proposed as the amount to be found as Plaintiff's damages ranged from $20,000 to $5,000, and it seems to us that the reference to the amount of a death award under the Compensation Law tended more to Plaintiff's hurt than to Defendant's. Plaintiff sued for $67,200.00.

These comments dispose of the Points of Error assigned. The judgment of the trial court is affirmed.