Antoine MERCIER, Appellant,

v.

TEXAS AND NEW ORLEANS RAILROAD COMPANY, Appellee.

No. 6026.

Court of Civil Appeals of Texas.

Beaumont.

June 14, 1956.

Rehearing Denied July 11, 1956.

Waldman & Wiggins, Beaumont, for appellant.

Keith, Mehaffy, McNicholas & Weber, Beaumont, for appellee.

ANDERSON, Justice.

The appellant, Antoine Mercier, who will also be referred to as plaintiff, brought suit against appellee, Texas and New Orleans Railroad Company, to recover damages for personal injuries which he alleges he sustained November 2, 1953, as a proximate result of negligence on the part of the defendant. The suit was brought under the Federal Employers' Liability Act, as amended in 1939, 45 U.S.C.A. §§ 51–60, the plaintiff representing that he was injured while in the course of his employment as one of the defendant's employees. Plaintiff claims to have suffered abdominal injuries as a result of doing work assigned him when, following an appendectomy, he returned to work as a section hand. He alleged in his petition, in substance, that, through one of its section foremen, the defendant was negligent (1) in assigning him the particular duties it did, (2) in ordering him back to work after he had made known to the foreman that he (the plaintiff) was having trouble with his side, and (3) in failing to assign him light work to do. The defendant answered by general denial, a general plea of contributory negligence (pleaded in diminution of damages, if any), a plea of contributory negligence as the sole proximate cause of plaintiff's alleged injuries, a plea of unavoidable accident, and by a special denial of its ability in the circumstances to foresee injury to the plaintiff. Trial was to a jury, but at the close of the plaintiff's evidence the defendant made written motion that a verdict be directed in its favor and the motion was granted. Judgment in favor of the defendant was rendered on the directed verdict, and the plaintiff has appealed.

The right of the plaintiff to sue under the Federal Employers' Liability Act is not contested on appeal. As a consequence, there are, in reality, but two questions before us for decision: (1) Was there any evidence of probative value raising a fact issue for the jury regarding negligence on the part of the defendant? (2) If so, was there any evidence of probative value to show that such negligence, if any, was a proximate cause of plaintiff's alleged injuries? Appellant's contention that the plaintiff was himself guilty of negligence which was the sole proximate cause of his injuries, if any, is so related to the second of the questions we have stated that it will either be disposed of or rendered of no importance, in so far as causation is concerned, by our answer to that question.

An appendectomy was performed in Houston on the plaintiff October 2, 1953, by a doctor supplied by the Hospital Association of the Southern Pacific Lines in Texas and Louisiana, an association which appears to have been composed of the railroad company's employees. Plaintiff, a section hand who worked out of Beaumont, reported back for work, and was put back to work, November 2, 1953. At the time of reporting for duty in the morning of that day he delivered to the regular foreman of his section gang, a Mr. Ladner, a letter addressed to the latter under date of October 12, 1953, by the chief surgeon of the Hospital Association. This letter advised Mr. Ladner that plaintiff had been in the General Hospital in Houston "for treatment" but would be ready for duty November 2, 1953. While the letter did not disclose that plaintiff had been operated upon or the nature of the treatment he had received, we must proceed upon the theory that Mr. Ladner had notice of the appendectomy, because the plaintiff testified that he had himself told Mr. Ladner of it some two weeks before returning to work. Plaintiff had been out of the hospital for three weeks or more at the time he reported back for duty.

Plaintiff was an experienced section hand and was familiar with the nature of the work he would be expected to do upon his return to duty. He had been regularly employed by the defendant as a member of

Mr. Ladner's section gang for a period of a year and a half or two years next preceding the date on which his appendix disabled him, and had participated in all of the various kinds of work required of section hands. He testified that at the time of resuming work on November 2nd he was as well aware of his physical condition and strength as anyone else was and believed himself fully capable of performing all of the ordinary tasks of his job.

During the morning of November 2nd, plaintiff and the other members of the crew were assigned the task of dislodging and placing on top of the ground imbedded cross-ties from which the rails had already been removed. In the afternoon they were assigned the task of loading the same cross-ties onto trucks. The cross-ties were estimated to have weighed an average of one hundred pounds each, but an occasional one would weigh as much as 125 or 150 pounds. The crewmen appear to have worked singly in loosening the ties and raising them to the crest of the roadbed, but two and often three of them joined in loading each tie onto the trucks. The cross-ties were loosened from the ground and raised by means of hand picks. We gather that one prong of a pick was inserted either under or in the end of a tie and that the end of the tie was then prized loose and lifted up. The dislodgment and initial raising of the ties, as well as the subsequent loading of them, was, according to plaintiff's testimony, heavy work which particularly called into play the abdominal muscles and subjected the abdominal wall to stress. Tongs were available with which to loosen the ties from the ground and raise them but plaintiff said he did not use the tongs because at the commencement of work the foreman had instructed him to use a pick. All members of the crew were doing the same kind of work, in the same manner, and the plaintiff had done similar work many times before. Plaintiff testified that the cross-ties were sunk deeper into the ground and were more firmly imbedded than most that he had previously removed but that after seeing them and being assigned the task of helping remove them from the ground and load them he had no doubt of his ability to do the work and did not foresee or anticipate injury to himself from doing it.

He claims, however, that the work and his own exertions in performing it did in fact cause him injury. He claims, and he offered medical testimony in support of his contention, that the abdominal muscles parted along the line of the operative incision and thereafter failed to reunite and that he is permanently incapacitated as a result. He does not contend that this was caused by any unusual occurrence or incident but only that it was brought about by his own exertions and by the ordinary stresses and strains to which his body was subjected in performing the tasks assigned him to do.

Plaintiff, as we understand his testimony, does not claim to have been actually injured until shortly after noon while loading a cross-tie. He does claim, however, to have noticed or to have experienced during the morning some unusual sensation in his side, the exact nature of which is not made clear by the record, and to have reported this to his foreman. His testimony regarding what passed between him and the foreman at that time was as follows:

### Direct-Examination

"Q. Did you have occasion there to see or talk to Mr. Ladner any more that morning? A. Well, about eleven o'clock, eleven thirty, Mr. Ladner happened to be standing by me, and I told him, I says 'My side looks like it's giving out on me; this work is a little too heavy for me, I think.'

\*　　\*　　\*　　\*　　\*　　\*

"Q. I believe you said you told Mr. Ladner it looked like your stomach was giving out? A. Yes, sir.

"Q. What did he say at that time? A. He ain't said nothing; but he told me to bring him up some work."

## Cross-Examination

"Q. Tell us what you told Mr. Ladner. A. Well, Mr. Ladner was standing there; I told him that my side was giving on me.

"Q. It hadn't 'give' at that time; it was just giving on you; is that right? A. And he told me to go on with the work, and he walked on away."

Plaintiff claims also to have reported to his foreman the sensations he (the plaintiff) experienced in the afternoon at the time he claims to have been injured. He testified:

## Direct-Examination

"Q. Did you have occasion to say anything to Mr. Ladner in the afternoon? A. Well, about 1:30 I felt like a little sting in the side [objected to as not being responsive].

"Q. All right. Did you say anything to Mr. Ladner along in the afternoon? A. Yes, sir.

"Q. About what time did you talk to Mr. Ladner? A. I talked to him along about 1:30.

"Q. What did you tell Mr. Ladner at that time? A. I told him that I felt that I was hurt, that something had broke loose in that cut.

\*　\*,　\*　\*　\*　\*

"Q. How did it feel? A. It felt like something had stung me. It burned.

"Q. Did it feel like it had pulled loose? A. Yes, sir.

"Q. Did you tell Mr. Ladner about that? A. Yes, sir.

"Q. What did he say then? A. Ain't said nothing; just walked on away and told me to continue work."

## Cross-Examination

"Q. What time was it that you saw Mr. Ladner that afternoon? A. About around 1:30.

"Q. Who was around there when you saw him then? All 7 of them? A. All 7 of us was around.

"Q. What did you tell Mr. Ladner then when all seven of you were around? A. I told Mr. Ladner that my side, I felt something had stung me, or either broke in my side.

"Q. How long before you told Mr. Ladner that had you felt that sting there? A. Right there and then, when I raised up that particular tie.

\*　\*　\*　\*　\*　\*

"Q. Weren't they [other members of the crew] standing there? A. After I loaded the tie on the truck, by me passing Mr. Ladner, I told him.

"Q. You were just walking down there to get another tie? A. Yes, sir.

Q. What did you say? A. I told him, after I throwed that tie in the truck and pass by him again, I told him, 'Mr. Ladner, I think something stung me; I think I broke something in my side; something pulled loose.'

"Q. All right; what did he tell you then? A. He ain't told me nothing; just walked on away.

"Q. He didn't tell you anything? A. No, sir."

Unless the testimony we have quoted is construed as a request that he be relieved from duty or permitted to rest or that he be assigned lighter work, the plaintiff requested none of these things. He worked all of November 2nd, which was a Monday, and then worked the balance of that week. At the end of work on Friday, he requested of his foreman a slip so that he could see a doctor. He said the doctor prescribed a belt to fit over the place where the incision was made and that he himself wore the belt regularly thereafter. After his first week of work, the plaintiff was on vacation for a week but he then returned and worked regularly on through April of 1954.

He said his side pained him most of the time and was swollen, but he does not appear to have made any complaint about it except on Monday following his return to work after his vacation. He said he then told the acting foreman, Mr. Cruz, about it. He first noticed the swelling, he said, after he had finished work and gone home on November 2nd. He said he continued to work because he needed to in order to support himself and family.

Plaintiff does not claim to have been given any special order to return to work following the noon hour on November 2nd; he merely returned to work when the rest of the crew did and was acting under the general instructions given the crew by the foreman.

Appellant argues that Gulf, Colorado & Santa Fe Ry. Co. v. Waterhouse, 223 S.W. 2d 654, 659, 661, decided by this court, requires that the judgment of the trial court be reversed. We there held the evidence sufficient to support jury findings of negligence and proximate cause, and a judgment in favor of the plaintiff, where the plaintiff had become overheated upon returning to work pursuant to a section foreman's order after reporting to the foreman that he, the plaintiff, was getting too hot. We approved the principle that the master "owes his servant the duty to use care for the servant's safety in ordering the servant into the performance of work", but said that "whether the master is negligent in ordering his servant to perform a task depends upon whether he ought to realize that the order exposes the servant to an *unreasonable* risk of harm." We stressed the fact that the plaintiff was *ordered* back to work, and returned to work pursuant to the order, after having impliedly requested to be relieved from duty.

■ Notice to the master of the servant's distressed condition is essential in such cases because there is otherwise no occasion for the master to anticipate probable harm to the servant and no duty to relieve the servant from further work or to alter his work-assignment arises. And, except in instances where the distressed condition of the servant is self-evident and of a nature to make it the duty of the master to take the initiative in relieving the servant from further work or in altering the servant's work-assignment, the master is under no duty to so relieve the servant or to change his work-assignment unless the servant either expressly or by implication requests such relief or change. In the absence of such a request there is no occasion for the master to appreciate the gravity of the situation or the seriousness of the servant's distress and no reason why he should anticipate that the servant is threatened with probable harm or injury. Furthermore, until the servant has requested to be relieved from further work or has requested a change in assignment and his request has been refused, or until he has either quit work or has undertaken to do so and has been ordered to continue working and has done so, the master can hardly be said to have done anything or to have refrained from doing anything that can be labeled as negligence.

■ Applying these rules to the facts of the case at bar, we are of the opinion that there was no evidence to support any of the plaintiff's allegations of negligence.

■ The foreman was not negligent in initially giving the plaintiff the work-assignment he did, because there was no occasion for him to anticipate that plaintiff would probably suffer harm or injury as a result of doing the work. At the time of presenting himself for work in the morning of November 2nd, the plaintiff not only held himself out to the foreman as being physically able to resume work and to perform the ordinary tasks of a section hand but also presented to the foreman a doctor's certificate to that effect. The foreman was justified in the circumstances in proceeding upon the theory that plaintiff was fully recovered from his operation and was subject to be dealt with as a normal,

able-bodied man. The work which was assigned plaintiff was not extra hazardous but was of a nature that enabled him to be his own judge of the extent to which he was willing to exert himself. It was furthermore the same kind of work that was assigned to the other workmen and was of a kind that plaintiff and his co-workers had performed in the same manner numerous times before without harm or injury to themselves. We think it cannot be said that an ordinarily prudent man would have done otherwise in the circumstances than the foreman did.

Since plaintiff was not ordered back to work after the noon hour, and since his injury, if any, was already an accomplished fact at the time he claims to have talked to the foreman after noon, the foreman's conduct after work had actually commenced in the morning must be appraised in the light of what plaintiff told him before noon and in the light of what the foreman then did or said, because only the one conversation appears to have been held between the two of them preceding plaintiff's alleged injury. There was no evidence to show that plaintiff received additional injuries or that he aggravated his existing injury after he talked to the foreman around 1:30 in the afternoon.

On direct examination, plaintiff testified that around 11:00 or 11:30 in the morning he told the foreman: "My side looks like it's giving out on me; this work is a little too heavy for me, I think." On cross-examination, he said he told the foreman that his (plaintiff's) side was "giving" on him. He further testified that the foreman then told him "to bring him up some work" and "to go on with the work."

■■ Plaintiff's statement to the foreman irrespective of whether he told him that his (plaintiff's) side seemed to be "giving out" on him or merely that it was "giving" on him, did not amount to a request, either express or implied, that he be relieved from further work or that he be given a different work-assignment. It was no more than a tentative appraisal by plaintiff of his physical reaction to the work he was doing and was not of a nature to require that the foreman take the initiative in relieving plaintiff from duty or in changing his work-assignment. It appears to have been merely a casual comment, made while the foreman was standing close to where plaintiff was working. The foreman was justified in the circumstances in taking no steps toward relieving plaintiff from duty until plaintiff had at least made up his own mind that he was threatened with probable harm or injury if he continued to do the work he was doing, because plaintiff's distressed condition was not self-evident and the foreman had only the plaintiff's representations to guide him. The evidence failed to raise the issue of negligence on the part of the foreman in failing to relieve plaintiff from duty or in failing to change his work-assignment at that time. No further complaint having been registered by plaintiff, the foreman clearly was not negligent in permitting him to return to work after plaintiff had rested through the noon hour. Furthermore, plaintiff's work assignment was changed after noon. The evidence does not disclose whether the new assignment was more or less arduous than the work plaintiff had been doing during the morning, but it is a fair inference that it was less so, because two and three men were engaged in handling each tie, where there had been only one man to a tie during the morning.

■ Assuming that what the foreman told plaintiff during their conversation before noon should be treated as an order to plaintiff to continue working, the matter is of no consequence. It does not appear to have affected plaintiff's conduct, because the evidence does not suggest that plaintiff had quit work or proposed to quit or even wanted to quit. Since there was no evidence to show that what the foreman said to him before noon caused plaintiff to pursue a course of conduct different from what he would have pursued otherwise, no

causal connection between what the foreman said and plaintiff's injury was shown. The same can also be said of what the foreman told plaintiff after noon, if it should be argued that plaintiff sustained additional injuries or aggravated his existing injury by continuing to work during the remainder of the afternoon after his second conversation with the foreman.

Appellant's points of error are all overruled and the judgment of the trial court is affirmed.