MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, a corporation, Plaintiff in Error,

v.

Georgia COUCH, Administratrix of the Estate of Otis O. Couch, Deceased, Defendant in Error.

No. 42655.

Supreme Court of Oklahoma.

July 13, 1971.

Rehearing Denied Aug. 3, 1971.

Certiorari Denied Jan. 10, 1972.
See 92 S.Ct. 678.

Rainey, Flynn, Welch, Wallace, Ross & Cooper, Oklahoma City, Joseph G. Ralls, Atoka, Lloyd W. Jones, Dallas, Tex., for plaintiff in error.

R. Kay Matthews, Atoka, James E. Driscoll, Seminole, for defendant in error.

LAVENDER, Justice.

This appeal involves a verdict and judgment in favor of the defendant in error, Georgia Couch, Administratrix of the Estate of Otis O. Couch, Deceased, as plaintiff, against the plaintiff in error, Missouri-Kansas-Texas Railroad Company, a corporation, as defendant, in the principal amount of $60,000.00 as damages for the wrongful death of the said Otis O. Couch.

The defendant will also be referred to herein as "the Katy" and as "the railroad."

Mr. Couch was an employee of the railroad, and it may reasonably be inferred from the evidence, was engaged in the performance of his duties at the time of his death. The action was brought, expressly, under the provisions of the Federal Employers Liability Act (45 U.S.C.A. §§ 51 and following).

At the time of his death, and for several months prior thereto, Mr. Couch was employed by the Katy as an "assistant roadmaster" for the portion of the railroad's line between Hominy, Oklahoma, and Oklahoma City, which was divided into three "sections" for maintenance-of-way purposes. Basically, it was his duty, as assistant roadmaster, to patrol that portion of the line, by railroad motorcar, to spot maintenance and repair work that needed to be done on the tracks, roadbed, crossings and right-of-way (including the clearing of brush and trees from the right-of-way), and to see that the required work was done. In his discretion, he could either do the work himself, or he could call in the regular section gang for the particular section of the line, or the "extra" gang assigned to his territory, to do the required work. He carried a number of hand-tools, including a "brush-axe," on his motorcar. No helper was assigned to ride and work with him, and he traveled alone.

His body was found, about seven o'clock in the evening on an August day, within the railroad's right-of-way and about seven or eight feet south of where his motorcar was standing on the track, about a mile and

a half southwest of Cushing, Oklahoma. The body was slumped over on the knees with the head on the stump of a recently-cut tree. A brush-axe was on the ground beneath the body. Two recently-cut trees, one of which was about 24 or 25 inches in diameter, were on the ground, almost parallel to the ballast line, in the vicinity of the body.

Mr. Couch had had lunch in Cushing with the Katy agent, and had left the Cushing station about 12:45 p. m., after getting the train schedule for the rest of the day. He appeared to be in good health. Some time around one o'clock that afternoon, the railroad motorcar was seen standing on the track at about the same point where it was when the body was found, and a man was seen cutting trees in the right-of-way just south of the motorcar, by one of the three men who found the body later that day.

Weather bureau records for the Stillwater station, the reporting station nearest Cushing, for that day show that, as of one p. m., the temperature was 97 degrees, the wind southerly at 11 M.P.H., and the relative humidity was 49 per cent; that, as of two p. m., the temperature was 98 degrees, the wind southerly at 10 M.P.H., and the relative humidity 43 per cent; that, as of 3:05 p. m., the temperature was 99 degrees, the wind southeasterly at seven M.P.H., and the relative humidity 47 per cent; that, as of 3:50 p. m., the temperature was 99 degrees, the wind southeasterly at 10 M.P.H., and the relative humidity 39 per cent; that, as of 4:55 p. m., the temperature was 98 degrees, the wind southeasterly at 17 M.P.H., and the relative humidity 37 per cent; that, as of 6:05 p. m., the temperature was 93 degrees, the wind southeasterly at 16 M.P.H., and the relative humidity 47 per cent; and that, as of 7:50 p. m., the temperature was 90 degrees, the wind southeasterly at 13 M.P.H., and the relative humidity 55 per cent.

Starting about 9:30 that same evening, an autopsy (without opening the cranium) was performed on the body in a funeral home at Oswego, Kansas. It was performed by Dr. W. of Parsons, Kansas, a practicing physician with special training in pathology and a number of years of practical experience in pathology and autopsies.

Based upon his observation and examination of the body, the heart, lungs, and abdominal organs, and the generally high temperatures prevailing in the area that day, and information given him concerning the type of work being done by Mr. Couch that day, Dr. W. stated, in his testimony by deposition as well as in his autopsy report:

"It is my opinion that this man died of acute heart failure and shock manifested by acute pulmonary edema which caused suffocation. It is also my opinion that heat that this man was exposed to on this date can be attributed to as the causative factor in the chain of events leading to his death. The evidence is sufficient that I would describe this as the syndrome of heat stroke."

The plaintiff alleged that the railroad was negligent in the following respects: Some eight years prior to the time involved herein, the defendant railroad had made a drastic reduction in the number of section gangs, and in the number of men comprising a section gang, used in the maintenance and repair of its 3,241.35 total miles of trackage and yardage, increased the length of the "section" assigned to each of the remaining section gangs, and created additional positions of "assistant roadmaster," with each one being assigned to patrol, and be responsible for the maintenance and repair of, several sections; that this wholesale reduction in the number of section gangs and in the number of men comprising a section gang continued until, about 18 months before the time involved herein, the number of section men for the railroad's 3,241.35 miles of line had been reduced from 762 to 105, and the number of assistant roadmasters had increased from 20 to 38; and that, at the time involved herein, the trackage, roadbed and right-of-way between Parsons, Kansas, and Oklahoma City, Oklahoma, was being patroled by Otis O. Couch, as assistant road-

master for that sector, and was being maintained and repaired by Mr. Couch, as assistant roadmaster, and one maintenance gang consisting of a foreman and seven laborers.

The plaintiff alleged that this wholesale reduction in the maintenance-of-way force violated the defendant's non-delegable duty to furnish its employees a reasonably safe method of doing the work assigned, as well as its non-delegable duty to furnish its employees a sufficient number of competent employees to do the work assigned; and that, "in view of the above and foregoing," the defendant violated its non-delegable duty to furnish Otis O. Couch a reasonably safe place in which to work; and that these acts of negligence on the part of the defendant, either separately or collectively, were the direct and proximate cause of the death of Otis O. Couch, the plaintiff's decedent.

There was evidence that at least some of the reduction in the labor force was the result of an increase in use by the railroad of mechanical equipment to do the work formerly done by hand labor.

■ The primary question, however, for determination here is whether or not the evidence is sufficient to support (a) a finding that the defendant negligently failed to provide a sufficient number of competent employees to perform the assigned work or a finding that the defendant failed in its duty to provide Mr. Couch with a reasonably safe place in which to perform his assigned duties and a reasonably safe method for performing those duties, and (b) a finding that there was a causal connection between such negligence and Mr. Couch's sudden heart failure and death. We answer that question in the negative.

Evidence supported substantially all of the plaintiff's allegations concerning the defendant's reducing its maintenance-of-way force and the number of "sections" for maintenance-of-way purposes.

Prior to the original reduction in force, which occurred about eight years before Mr. Couch became assistant roadmaster for the Katy's line between Hominy and Oklahoma City (a distance of about 108 miles), the roadmaster for the line from Parsons, Kansas, through Hominy, to Oklahoma City had eleven section foremen (eleven maintenance-of-way sections) and fourteen section laborers working under him on the line between Hominy and Oklahoma City. In addition to Mr. Couch as assistant roadmaster, that roadmaster had, at the time of Mr. Couch's death, three section foremen (three maintenance-of-way sections) and five section laborers, and an extra gang, also referred to as a "mobile gang," consisting of a foreman and five laborers working out of Cleveland, Oklahoma, working under him on the line between Hominy and Oklahoma City.

The trial court admitted in evidence, over the objection of the defendant, a series of 23 black-and-white photographs that had been taken four or five months before Mr. Couch took this particular job some eight months before his death, at various points on the right-of-way between Hominy and Oklahoma City. They showed some trees and some brush or weeds on the right-of-way. The Katy's division engineer admitted, on cross-examination, that those pictures showed a "pretty sorry state of upkeep" insofar as the right-of-way (other than the track and roadbed) was concerned.

The plaintiff introduced into evidence two black-and-white photographs taken at the scene of Mr. Couch's death. Each shows some weeds or brush in the area, one standing tree with a branch growing outward just above the ground, and two adjacent trees that appear to have been recently cut. The body was found at the base of these trees.

The defendant introduced into evidence a number of color slides taken in the same general area. There are a number of different views of one standing tree with a branch growing outward near the ground and two adjacent trees that appear to have been recently cut. The railroad employee who took these pictures said that one of

the two cut trees measured 25 inches in the diameter and the other one 23 and a half inches in diameter. On that basis, some of the weeds in the area were as much as two and a half to three feet high. One of these photographs disclosed that the branch growing out of the standing tree, just above the ground, had been chopped part of the way through. The employee said that this branch was 17 inches in diameter. Another one of these photographs shows another felled tree in the area, but the employee gave no estimate of the size of that tree.

There was evidence to the effect that Mr. Couch's duties, as assistant roadmaster, combined some of the duties of several jobs, including some of those of a section foreman; that a section foreman for the Katy, and for at least one other railroad company operating in Oklahoma (which, incidentally, had roadmasters, right-of-way supervisors, and section foremen and laborers, but no assistant roadmasters), generally was assigned one laborer to ride and work with him, whereas no one was assigned to ride and work with Mr. Couch or any other assistant roadmaster for the Katy. When asked if there was any other method by which Mr. Couch could have accomplished his assigned duties, a longtime maintenance-of-way employee of the other railroad made statements (objected to by the defendant) to the effect that Mr. Couch should have had a man to help him with the motorcar, to operate it so that Mr. Couch could give his undivided attention to his inspection of the track, roadbed and right-of-way, and to help him remove the motorcar from the track, and to help Mr. Couch with the maintenance work and change off with him so that he wouldn't get too hot cutting brush and trees, and also to render aid, or get aid, in case anything happened to Mr. Couch.

When asked if there was any additional method by which Mr. Couch could have accomplished his assigned duties, this same witness made a statement (objected to by the defendant) to the effect that the Katy's system prior to the reduction in force, using more maintenance-of-way "sections" and employees, was a proper method for accomplishing the assigned work.

The evidence does not indicate that the holder of any job not abolished in any reduction of force was required to produce more work or results in a given time than before the reduction in force. It does not indicate that it was the duty of Mr. Couch, as assistant roadmaster, to see that the right-of-way between Hominy and Oklahoma City was put and/or kept in any better condition than the "sorry state of upkeep" indicated by the 23 photographs that were taken some eight months before he took that job. Nothing in any of the photographs taken at the scene of Mr. Couch's death indicates that more than one man would be required to do the type of work he apparently was doing just before his death.

The plaintiff made no attempt to show that a railroad right-of-way (even one in the "pretty sorry state of upkeep" indicated by the 23 photographs taken about a year before Mr. Couch's death), or the area on this particular right-of-way where Mr. Couch was working just prior to his death, is not a reasonably safe place for a person to be chopping trees or brush with a brush-axe, at least when, as in this instance, no equipment is moving on the adjacent railroad track. She made no attempt to show, and she does not argue, that it was the railroad's duty to provide an employee with protection from the sun and/or the heat while chopping trees or brush on its right-of-way on a very hot day.

Insofar as the evidence is concerned, inspection of the track, roadbed and right-of-way, operation of the motorcar, and removing it from the track had nothing whatsoever to do with Mr. Couch's sudden heart failure and death. That Mr. Couch and another employee might have taken turns chopping trees or brush and that Mr. Couch would have rested while the other employee chopped, if there had been another employee riding and working with him, is pure surmise. Insofar as the evi-

dence is concerned, Mr. Couch's heart would have suddenly failed, in the circumstances, regardless of how many men were chopping trees or brush alongside him. There is no evidence that any one could have saved Mr. Couch's life after heat stroke commenced (if he suffered heat stroke) or after his heart suddenly stopped functioning.

The plaintiff in the brief filed herein on her behalf and in oral presentation of this cause before the entire court has called our attention to a number of decisions of both the U. S. Supreme Court and the Federal courts of appeals, as well as decisions of other state courts. We have carefully studied these authorities and, while it is well established that what constitutes negligence which will make a railroad liable in damages under the Federal Employers' Liability Act is a federal question (Urie v. Thompson (1949), 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282; and Rogers v. Missouri Pacific Railroad Co., (1957), 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed. 2d 493), it is equally well established that "The Federal Employers' Liability Act is founded on common law concepts of negligence and injury * * *." (Urie v. Thompson, supra.) It is also said, "A railroad is not an insurer under the Federal Employers' Liability Act of the safety of its employees; the act does not authorize a recovery in the absence of negligence and there can be no negligence on the part of the employees of the carrier unless they fail to discharge some duty which they owe to the injured servant." (56 C.J.S. Master and Servant § 173, pages 849 through 851, the footnotes to which refer to a number of state and federal cases.)

In the 15th syllabus paragraph in Urie v. Thompson the Supreme Court said, "Ordinary care to be exercised by railroad to avoid liability under Federal Employers' Liability Act must be commensurate with known dangers and must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated from neglect." In the more recent case of Gallick v. Baltimore and Ohio Railroad Co., (1963), 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618, the court (citing a number of its previous opinions) stated, "Reasonable foreseeability of harm is an essential ingredient of Federal Employers' Liability Act negligence."

In the Gallick v. B. & O. case the employee foreman was held entitled to recover for disability resulting from an insect bite suffered under circumstances indicating knowledge on the part of the railroad that there was a stagnant, putrid pool of water in and about which such type insects had been observed for years; that the pool was on the right-of-way and that employee in performing his work was required to stand nearby.

In the Urie v. Thompson case the negligence consisted of using 80 to 90 per cent silica or silicon dioxide in the sand used by the railroad coupled with "faultily adjusted sanders." It was said that the railroad should have foreseen that its employee exposed to such sand, while working, for a number of years would eventually contract silicosis.

In Dennis v. Denver & Rio Grande Western Railroad Co. (1963), 375 U.S. 208, 84 S.Ct. 291, 11 L.Ed.2d 256, the negligence consisted of "permitting" the employee to continue to work in freezing weather conditions when the foreman knew that "petitioner was dressed less warmly than the other members of the crew." There was also evidence the foreman knew that petitioner was complaining of burning and tingling sensations in his fingers. (Recovery was allowed for frost-bitten fingers.) The railroad's liability was said to be for the jury to determine because the foreman "who had full control over the petitioner's activities while on this job, did not take all necessary and reasonable precautions to prevent injury to petitioner when put on notice of his (petitioner's) condition." (There was evidence that the employee could have been allowed to warm up in a heated truck standing nearby.)

In a special concurring opinion in the case of Tiller v. Atlantic Coast Line Rail-

road Co., (1943), 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, Mr. Justice Frankfurter, after discussing the 1939 amendment to the Act which removed the defense of assumption of risk, wrote (p. 71 of 318 U.S., p. 453 of 63 S.Ct., p. 619 of 87 L.Ed.) :

"But the 1939 amendment left intact the foundation of the carrier's liability— negligence. Unlike the English enactment which, nearly fifty years ago, recognized that the common law concept of liability for negligence is archaic and unjust as a means of compensation for injuries sustained by employees under modern industrial conditions, the federal legislation has retained negligence as the basis of a carrier's liability. For reasons that are its concern and not ours, Congress chose not to follow the example of most states in establishing systems of workmen's compensation not based upon negligence. * * *"

and,

"(the 1939 legislation) has left undisturbed the other meaning of 'assumption of risk,' namely, that an employee injured as a consequence of being exposed to a risk which the employer in the exercise of due care could not avoid is not entitled to recover, since the employer was not negligent."

In other words, the removal of "assumption of risk" as a defense available to the railroad did not relieve the employee's survivors from establishing that the railroad breached some duty of ordinary care which resulted in whole or in part in the employee's death.

Summarizing the record in this case we think it fairly shows the employment of an able-bodied man by the railroad to do certain work along the railroad's right-of-way, which work included using a brush axe to cut brush and trees. The right-of-way had been permitted to grow up in brush and trees to such an extent that one of the defendant's witnesses described it as "sorry." There was no evidence that with the corresponding reduction in personnel available to do maintenance of right-of-way work that the remaining employees were required by the railroad to do any more of that type of work than they had done formerly. The right-of-way was simply not maintained as well as—apparently—it had been before the reduction in number of employees.

Absent some showing that the remaining employees were required, in effect, to over-exert themselves in doing maintenance-of-way work much as Mr. Couch apparently did before he suffered the fatal collapse, we fail to see any reasonable connection between the railroad's act in reducing personnel and the death of Mr. Couch while cutting trees and brush. The theory argued by counsel for plaintiff, that Mr. Couch may have over-exerted himself because he was ambitious for a promotion, hardly furnishes sufficient grounds to impose liability for negligence in tort upon the railroad.

The fact remains that Mr. Couch was under no compulsion by his employer to do the work which he was doing when he collapsed in the manner in which he was doing it, that is to say, over an extended and prolonged period of time during the hottest hours of a summer day. That Mr. Couch would choose to do the work in such manner could not reasonably have been foreseen by the railroad. The latter had a right, we think, to assume that Mr. Couch would himself exercise some reasonable discretion and common sense about the way in which he performed the work. While the railroad cannot claim Mr. Couch assumed the risks of his employment and therefore his survivors cannot recover, neither may the latter contend successfully that under the circumstances of this case and notwithstanding the exercise of poor judgment on the part of their decedent the railroad should be held to respond in damages based on negligence.

The situation in this case is not like that directly involved in Gulf, Colorado & Santa Fe Railway Company v. Waterhouse (Texas Civ.App.), 223 S.W.2d 654, wherein the

railroad employee reported to his foreman that he was getting dizzy, after chopping brush on the right-of-way for some time on a very hot summer afternoon with little or no wind, and was ordered to go back to work. It is more like the situation in that case before the man reported that he was dizzy and was ordered back to work, wherein the employee was an experienced workman, accustomed to doing manual labor in hot weather, and was free to adjust his efforts to the prevailing weather and his own physical capacity.

Like the defendants in Moses v. Harris et al. (1925), 111 Okl. 54, 237 P. 591, the defendant in the present case demurred to the plaintiff's evidence and, at the close of all of the evidence, moved for a directed verdict. That motion was overruled. In that case, this court held, in the first paragraph of its syllabus:

"On a challenge to the sufficiency of the evidence to support the verdict, the question presented on appeal is, admitting the truth of all the evidence of the plaintiff, together with such inferences and conclusions as may reasonably be drawn therefrom, eliminating all evidence of defendant in conflict with plaintiff's evidence, and all opposing inferences, whether there is any competent evidence tending to support the verdict against defendant."

The parties hereto do not question that rule. Applying it to the present case, there is no competent evidence reasonably tending to support a finding that negligence on the part of the defendant railroad played any part whatsoever in Mr. Couch's sudden heart failure and death. The trial court erred in overruling the defendant's motion for a directed verdict. The verdict and judgment rendered thereon must be set aside on appeal. [Moses v. Harris et al., supra].

This view makes it unnecessary for us to consider any other questions raised by either of the parties.

The judgment in favor of the plaintiff and against the defendant is reversed and the cause remanded to the trial court with directions to enter judgment in favor of the defendant and against the plaintiff.

All of the Justices concur.